**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SNAPRAYS, LLC DBA SNAPPOWER, a Utah limited liability company,<br>Plaintiff,<br>v.<br>AMERICAN TACK & HARDWARE COMPANY INC.,<br>Defendant. | Case No. 3:24-cv-1228-O<br><br>Honorable Chief Judge Reed O'Connor<br><br>[Filed Electronically] |
| AMERICAN TACK & HARDWARE COMPANY INC.,<br>Counter Claimant,<br>v.<br>SNAPRAYS, LLC DBA SNAPPOWER, a Utah limited liability company,<br>Counter Defendant. | |

**<u>SNAPPOWER'S OPPOSITION TO AMERICAN TACK'S MOTION FOR LEAVE TO AMEND ITS INVALIDITY CONTENTIONS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii
I. BACKGROUND ..... 1
II. APPLICABLE LAW ..... 5
A. Invalidity Contentions ..... 5
B. Amending Invalidity Contentions ..... 6
C. Seeking Leave for Expert Testimony Outside the Invalidity Contentions. ..... 8
D. Legal Guardrails on Obviousness. ..... 9
III. ARGUMENT ..... 11
A. Keystone ..... 11
1. American Tack Lacks Good Cause to Amend. ..... 11
2. Importance of Keystone ..... 12
3. Prejudice of Keystone ..... 17
B. American Tack Lack Good Cause to Add Smith Provisional ..... 19
C. American Tack Lacks Good to Add New Invalidity Theories ..... 20
D. Continuance Is Not Available ..... 21
E. American Tack Cannot Bootstrap Good Cause by Vilifying SnapPower. ..... 21
IV. CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)....................10, 13, 14

*Arbitron, Inc. v. Int'l Demographics Inc.*,
No. 2:06-CV-434 (TJW), 2009 WL 166555 (E.D. Tex. Jan 16, 2009)....................8

*In re Clay*,
966 F.2d 656 (Fed. Cir. 1992)....................9, 12

*Core Wireless Licensing, S.A.R.L. v. LG Elecs., Inc.*,
No. 2:14-CV-911-JRG-RSP, 2016 WL 3655302 (E.D. Tex. Mar. 21, 2016)....................5

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018)....................9

*Ecolochem, Inc. v. S. California Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000)....................10, 14

*Estech Sys., Inc. v. Target Corp.*,
No. 220CV00123JRGRSP, 2021 WL 5154220 (E.D. Tex. July 21, 2021)....................8, 12

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
822 F.3d 1312 (Fed. Cir. 2016)....................5

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014)....................9

*Ironworks Patents LLC v. SamsungElectronics Co.*,
No. 17-cv-01958-HSG, 2017 WL 4573366 (N.D. Cal. Oct. 12, 2017)....................20

*K-Tec, Inc. v. Vita-Mix Corp*.,
696 F.3d 1364 (Fed. Cir. 2012)....................9

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012)....................10

*Mass Engineered Design v. Egrotron, Inc.*,
No. 2:06–cv–272, 2008 WL 1930299 (E.D.Tex. Apr.30, 2008)....................7

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012)....................9, 10

*Nanology Alpha LLC v. Witec*,
Case No. 6:16-CV-00445-RWS (E.D. Tex. July 11, 2018)....................................................9

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006)..........................................................................................5, 7

*Pisony v. Commando Constructions, Inc.*,
No. 6:17-CV-00055-ADA, 2020 WL 4934463 (W.D. Tex. Aug. 24, 2020)............................5

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009)..........................................................................................10, 14

*Realtime Data, LLC v. T-Mobile, U.S.A., Inc.*,
No. 6:10CV493, 2013 WL 12149180 (E.D. Tex. Feb. 8, 2013)..............................................5

*Summit 6 LLC v. HTC Corp.*,
No. 7:14-CV-00014-O, 2013 WL 11514929 (N.D. Tex. Nov. 16, 2014) ................................7

*TurboChef Techs., Inc. v. Garland Com Indus., LLC*,
No. 3-07-CV-1330-F, 2010 WL 11618098 (N.D. Tex. Mar 9, 2010) ......................................7

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)........................................................................................10, 16

**Statutes**

35 U.S.C. § 102.......................................................................................................................5

35 U.S.C. § 103.......................................................................................................................9

**Rules**

Fed. R. Evid. 408 ..................................................................................................................22

LPR 3-3........................................................................................................................ passim

LPR 3-3, 3-6............................................................................................................................4

LPR 3-3(a)(1-3) .....................................................................................................................19

LPR 3-3(a)(2)....................................................................................................................6, 20

LPR 3-3(a)(3).........................................................................................................................20

LPR 3-3(b) ..............................................................................................................................6

LPR 3-6...................................................................................................................................6

LPR 3-7(b) ..............................................................................................................................6

On October 21, 2025, after deposing Defendant's technical expert Dr. Harry Direen, Plaintiff moved to strike invalidity theories and references from Defendant's expert that were not disclosed during fact discovery. ECF 121. Defendant opposed and now moves for leave to amend its Invalidity Contentions (ECF 127, "Motion to Amend") to bring Dr. Direen's new theories and references into the case. Defendant's argument, in a nutshell, is that due process permits Defendant to ambush Plaintiff with new arguments and evidence after the close of fact discovery if it promotes a "just" outcome of the case. This argument inverts the meaning of due process. Due process is not any process that reaches the "correct" outcome, as judged by a party. Rather, the rules of procedure establish a just *process*, where parties have notice of the claims and arguments raised against them, discovery to develop rebuttal arguments and evidence, and an opportunity to be heard by an impartial arbiter. Injecting new evidence and arguments after the close of discovery, thereby curtailing a party's ability to develop rebuttal arguments and evidence, without good cause because the new material was available from the beginning of the case, is exactly the kind of *unjust* process that the rules are designed to prohibit.

American Tack attempts to minimize the prejudice created by its untimely disclosures even though American Tack has had more than a year to search for and disclose the Keystone reference, which is fraught with legal deficiencies, and other invalidity theories, to SnapPower. American Tack has no good cause to amend a year and a half into litigation, after the close of discovery, and only a few months before trial when the material sought to be added by amendment has been publicly available the entire time. American Tack lacks good cause for disclosing new evidence and new invalidity theories after the close of discovery, much less for the consequential prejudice to SnapPower. The Court should deny the Motion to Amend.

# I. BACKGROUND

The Invalidity Report of American Tack's technical expert Dr. Direen included new prior art references as well as new invalidity theories not disclosed in American Tack's Invalidity Contentions or in American Tack's Supplemental Invalidity Contentions. These are set forth in detail in SnapPower's Motion to Strike. ECF 121. To summarize, Dr. Direen's Invalidity Report

introduces for the first time the "Keystone" battery spring contact part number 108-2, claiming to date back to May 17, 1993 ("Keystone"). Additionally, the Invalidity Report introduces several new invalidity theories of anticipation and obviousness, including based on the "Smith Provisional," which was not asserted as an invalidating reference in the Invalidity Contentions. Finally, the Invalidity Report introduces new combinations of prior art against specific claims. Each of these new references and invalidity theories was available to American Tack throughout the case, yet American Tack did not develop its theories early enough to comply with the rules.

American Tack's eleventh-hour injection of Keystone into its expert's Invalidity Report created significant logical and factual gaps in its own evidence. For instance, the parties' technical experts agree that the relevant field is powered cover plates. The Keystone reference is not in that field. Further, Dr. Direen offered no explanation for how a skilled person would join Keystone to a powered cover plate because he "found no reason to." Direen Tr. 58:16-24. Dr. Direen acknowledged that the attachment mechanism of Keystone (a soldering pin at the bottom of the Keystone part) would not be useful in adding Keystone into a powered cover plate. Dr. Direen admitted that "he was not suggesting that it [Keystone] would be used directly" in the prior art references. Direen Tr. 58:13-14. These gaps reduce the importance of Keystone and heighten the prejudice of American Tack disclosing Keystone *after* discovery.

Defendant relies heavily on the fact that SnapPower addressed the new prior art and invalidity theories in Mr. Horenstein's rebuttal expert report. ECF 127, 3, 6, 9, 12. Given that these new theories were disclosed a mere two weeks before the deadline for Mr. Horenstein's rebuttal report was due (*see* ECF 65), SnapPower had no opportunity to get a decision on its objections to the improper portions of Dr. Direen's report before the rebuttal report deadline. Consequently, out of an abundance of caution SnapPower did the best it could in the timeframe it had with ***no*** discovery on the new art and theories. Defendant now uses SnapPower's exercise of an abundance of caution in responding to the improper material as grounds to allow the improper material into the case. Essentially, Defendant argues that SnapPower was forced to decide between (1) "betting the house" that the improper new art and theories would be stricken and provide no response in

Mr. Horenstein's rebuttal report (and thus be left with no rebuttal at trial if the motion to strike is denied), or (2) "folding" by addressing the improper material in Mr. Horenstein's rebuttal report thereby (Defendant argues) removing the prejudice of allowing the new art and arguments into the case. Defendant's attempt to put SnapPower in such a predicament is improper and unjust. SnapPower's decision to "hedge its bet" should not be held against it as it entirely Defendant's actions that created the dilemma. SnapPower's agility in responding to new theories on the fly during expert disclosure does not cure the prejudice, does not give Defendant good cause to amend, and certainly does not waive SnapPower's right to object. Defendant's argument that SnapPower's service of Mr. Horenstein's rebuttal report without first objecting to the improper new art and invalidity theories is baseless for the same reason. Defendant cites no rule or law requiring SnapPower to object prior to serving the rebuttal report, and no rule or law that SnapPower's objection is untimely because there is none.

Defendant tries to shift blame to SnapPower's infringement contentions. SnapPower's Preliminary Infringement Contentions brought 115 patent claims across 7 patents (ECF 94-1) because American Tack willfully infringed all of them, in flagrant disregard of SnapPower's warning letters in 2020 and U.S. Customs' exclusion of the Accused Products in 2023. *See* Declaration of Elliott Williams (Williams Decl.) Exhibits 2 and 3. SnapPower intended to reduce the number of asserted claims after claim construction and before trial. However, in response to the Court's order to reduce the number of asserted patent claims from 115 down to 20 after claim construction briefing but before the *Markman* hearing (ECF 59), SnapPower conducted a careful analysis of the strength of each asserted patent claim on the issues of infringement *and validity*. Six months prior, the parties had already disclosed their respective Infringement and Invalidity Contentions, under Local Patent Rules (LPR) 3-2 and 3-3. The parties had also already completed claim construction briefing based on those contentions. Defendant's LPR 3-3 Invalidity Contentions played a key role in SnapPower's selection of the 20 patent claims to assert in this case going forward. *Every* claim asserted in this case was charted in SnapPower's Initial Infringement Contentions; Defendant's complaint of "SnapPower's ever-shifting barrage of

infringement claims" (ECF 127, 1) is unfounded and patently false. In light of SnapPower's reliance on Defendant's Invalidity Contentions, American Tack must have good cause to overcome the presumption against a "shifting sands" approach to invalidity contentions. Yet, American Tack has no good cause. The new references were publicly available to American Tack from the beginning of this case, as were the new invalidity theories. No good cause supports Defendant's new invalidity references or theories.

SnapPower timely served Final Infringement Contentions on July 11, 2025, that introduced claim charts to Defendant's Gen 3 product that created during the pendency of this case. ECF 110-1, ¶ 13. As explained in detail in SnapPower's opposition to Defendant's motion to strike the Final Infringement Contentions, the Final Infringement Contentions were served in an attempt to appease Defendant's complaint that the Preliminary Infringement Contentions did not chart the asserted claims against Defendant's Gen 3 product it introduced during the pendency of this case, despite the fact the Gen 3 product fell within the definition of "Accused Products" in the Preliminary Infringement Contentions.[1] Unlike the new art and references Defendant seeks to introduce via its Final Invalidity Contentions, the infringement analysis of the Gen 3 product is the same as that for the Gen 2 product given the near identical structure of the new Gen 3 and previously charted Gen 2 products. *See* ECF 110, 3-6. Another critical factual distinction between SnapPower's Final Infringement Contentions and Defendant's Final Invalidity Contentions is that SnapPower informed Defendant that its Gen 3 product was an "Accused Product" ***during fact discovery*** and Defendant *expressly confirmed that its discovery responses included all responsive information concerning its Gen 3 product.* ECF 110, 5; ECF 110-1, ¶¶ 10-11. In contrast, Defendant seeks to introduce new references and invalidity theories *after* the close of discovery.

Defendant argues that it delayed only "26 days" in disclosing its new art and invalidity theories, bolding and italicizing "26 days" ten times through its brief as though if it shouts it long

[1] SnapPower's Preliminary Infringement Contentions identifies the Accused Products as "the LumiCover and GloCover products, including those listed in the chart below, and any other products with substantially equivalent structure and function that have been designed, made, imported, offered, or sold by Defendant or at Defendant's request[.]" ECF 94-1.

and loud enough it will become true. But the deadline to disclose invalidity contentions without showing good cause was October 18, 2024, not July 31, 2025. *See* ECF 33; LPR 3-3, 3-6. Thus, Defendant delayed more than *ten months,* not 26 days as it alleges.

## II. APPLICABLE LAW

### A. Invalidity Contentions

Local Patent Rules require parties to timely serve invalidity contentions to "crystalize their theories of the case early in litigation so as to prevent the 'shifting sands approach'" (*Core Wireless Licensing, S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG-RSP, 2016 WL 3655302, at *1 (E.D. Tex. Mar. 21, 2016)) and to "provide notice while discovery is intended to develop details so that legal theories become more concrete as the litigation progresses." *Pisony v. Commando Constructions, Inc.*, No. 6:17-CV-00055-ADA, 2020 WL 4934463, at *1 (W.D. Tex. Aug. 24, 2020) (alterations in original) (quoting *Realtime Data, LLC v. T-Mobile, U.S.A., Inc.*, No. 6:10CV493, 2013 WL 12149180, at *3 (E.D. Tex. Feb. 8, 2013)). District courts have broad discretion to enforce local patent rules to "require parties to state early in the litigation and with specificity their contentions with respect to infringement and invalidity." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1359 (Fed. Cir. 2006); *see also Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1320 (Fed. Cir. 2016) (affirming district court enforcement of local patent rules under abuse of discretion standard).

In this Court, the Local Patent Rules ("LPRs," Miscellaneous Order No. 62) govern disclosure of Invalidity Contentions. LPR 3-3. Local Patent Rule 3-3(a)(1) expressly requires invalidity contentions to include:

> (1) The identity of each item of prior art that allegedly anticipates each asserted claim or renders it obvious. Each prior-art patent must be identified by its number, country of origin, and date of issue. Prior art under 35 U.S.C. § 102 that is not a patent or printed publication must be identified by specifying the item in public use, offered for sale, on sale, or otherwise available to the public before the effective filing date of the claimed invention, the date the offer or use took place or the information became available, the identity of the person or entity that made the use or made and received the offer, the person or entity that made the information available, and to whom it was made available.

> (2) Whether each item of prior art anticipates each asserted claim or renders it obvious. If a combination of items of prior art makes a claim obvious, each such combination, and the motivation to combine such items, must be identified.
>
> (3) A chart identifying, specifically and in detail, where in each alleged item of prior art each element of each asserted claim is found . . . .

Misc. Order No. 62-3, at 12. LPR 3-3(a)(2) requires that if a combination of items of prior art makes a claim obvious, the invalidity contentions must also identify each such combination and the motivation to combine such items. *Id.* LPR 3-3(b) states that a failure to comply with those requirements of specificity and detail may result in appropriate sanctions. *See id.* Additionally, the operative Scheduling Order (ECF 65) implemented a joint motion of the parties to amend the scheduling order (ECF 63) and specified July 31, 2025, as the date for Final Invalidity Contentions.

**B. Amending Invalidity Contentions**

The deadline for invalidity contentions was the *preliminary* contentions deadline, October 18, 2024, *not the final contentions deadline*. ECF 33 (Scheduling Order) at 2; *see* LPR 3-6 ("Each party's preliminary infringement contentions and preliminary invalidity contentions will be deemed to be that party's final contentions, except as set forth below."). This Court's Rule 16 Order (ECF 33) noted that "[p]ursuant to P.R. 3-6, *preliminary invalidity contentions are deemed final* unless amended as set forth in P.R. 3-6(b) or 3-7." ECF 33 at 2 (emphasis added). Except in circumstances not applicable to Defendant's Invalidity Contentions, amendment of preliminary or final invalidity contentions may be made only by order of the presiding judge upon a showing of good cause. LPR 3-7(b). To make a showing of good cause, the amending party must file a motion to amend that identifies newly discovered prior-art references and includes a statement that the newly discovered prior-art references were not known to that party prior to the motion *despite diligence in seeking out the same*. *Id.*

Local Patent Rules provide that "[a]mendment of preliminary or final infringement contentions . . . may be made only by order of the presiding judge upon a showing of good cause." Misc. Order No. 62, 3-7. "A party seeking amendment ... must include in its motion to amend a

statement that the newly discovered accused instrumentalities... were not known to that party prior to the motion despite diligence in seeking out same." Misc. Order. No. 62, 3-7(b).

According to the Federal Circuit, good cause "requires a showing of diligence." *O2 Micro Int'l v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006). Under the Local Patent Rules, "good cause" may include newly discovered accused instrumentalities or newly discovered bases for claiming infringement, or newly discovered prior-art references were "not known to that party prior to the motion despite diligence in seeking out the same." *See* Misc. Order No. 62, 3-7(b).

In determining whether to grant leave to amend infringement contentions past a deadline to do such, courts in the Northern District of Texas have considered the following factors:

1. The reason for the delay and whether the party has been diligent;
2. The importance of the particular matter and whether a lesser sanction would adequately address the other factors to be considered;
3. The danger of unfair prejudice to the non-movant; and
4. The availability of a continuance and the potential impact of a delay on judicial proceedings.

*Summit 6 LLC v. HTC Corp.*, No. 7:14-CV-00014-O, 2013 WL 11514929, at *2 (N.D. Tex. Nov. 16, 2014) (denying motion to amend in-part for products known and publicly available before commencement of the action).

In the Northern District of Texas, sufficient diligence does not exist where the information for amendment has been publicly available since before the commencement of the action. *See Summit 6*, 2013 WL 11514929, at *6 (disallowing historical products publicly available before commencement of the action because of inadequate diligence). A party's untimely discovery of publicly available information shows inadequate diligence. *See id.* This is in contrast to situations, such as in SnapPower's Motion to Amend (ECF 111), where the amending party was delayed by the counterparty in obtaining relevant information. *E.g., Mass Engineered Design v. Egrotron,*

*Inc.,* No. 2:06–cv–272, 2008 WL 1930299, at *3–4 (E.D.Tex. Apr.30, 2008) (granting leave to amend where disclosure was hindered by lack of cooperation of counterparty).

The importance of the amendment considers the effect of denying amendment on the remainder of the case. When the subject matter of the amendment was not important enough for a party to include in its initial or final invalidity contentions, the Court may view with skepticism the assertions that the amendment is vital to the amending party's defense. *Estech Sys., Inc. v. Target Corp.*, No. 220CV00123JRGRSP, 2021 WL 5154220, at *4 (E.D. Tex. July 21, 2021) (finding such assertions "severely undercut" by Defendants' decision not to include the theories in earlier disclosures). Further, importance is weighed objectively; the amending party's assertions need not be taken at face value.

Whereas prejudice to the nonmovant may be outweighed by actual notice of the newly discovered information or legal theory, ambushing a party with new contentions without prior notice and after the close of discovery is highly prejudicial. Unlike amendments when discovery is still ongoing to an extent and the trial is months away, American Tack's disclosure *after discovery* weighs against leave to amend. *Cf. Arbitron, Inc. v. Int'l Demographics Inc.*, No. 2:06-CV-434 (TJW), 2009 WL 166555, at *2 (E.D. Tex. Jan 16, 2009).

### C. Seeking Leave for Expert Testimony Outside the Invalidity Contentions

Where an expert report includes new prior art references, a new invalidity theory can be found and excluded, even where invalidity contentions included general terms that could arguably be construed to encompass the new prior art references. In *Anascape,* the court struck portions of the expert invalidity report that exceeded scope of invalidity contentions, including striking (1) prior art combinations that had references not explicitly disclosed in invalidity contentions, and (2) references that were included in invalidity contentions and even charted element by element for anticipation, but as to obviousness were merely listed among a list of other references and were not charted in a way that explained specifically where each element of each asserted claim was found. 2008 WL 7180756, *3-4. In striking the undisclosed invalidity theories court stated, "The

local patent rules do not allow a defendant to throw a generic term into its invalidity contentions and use it to encompass several prior art references." *Id.*

Striking portions of an expert report is especially proper where the party knew about the previously undisclosed prior art and failed to include it in its contentions or where the party is otherwise without a good excuse for not including the theory in its invalidity contentions. General assertions found in the contentions are not sufficient to put a party on notice of new references. *See Nanology Alpha LLC v. Witec*, Case No. 6:16-CV-00445-RWS at *7 (E.D. Tex. July 11, 2018) (striking new references).

**D. Legal Guardrails on Obviousness**

Under 35 U.S.C. § 103, an obviousness defense requires proof by clear and convincing evidence that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." This statutory test requires factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375 (Fed. Cir. 2012) (citations omitted).

Prior art is limited to the same field of endeavor as the invention or analogous art. *See K-Tec, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1374-76 (Fed. Cir. 2012). A reference is "analogous art" to the Asserted Patents if it is "reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992). Identifying the relevant field of the invention guards against improper hindsight. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1376 (Fed. Cir. 2012) (vacating obviousness determination that relied on erroneous assessment of the field of the invention).

"A reason for combining disparate prior art references is a critical component of an obviousness analysis." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014). Modification of a reference, like combining of references, is an obviousness argument that must be supported by a motivation to combine, from the perspective of a skilled person in the

field of the invention at the time of the invention. *E.g., DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374 (Fed. Cir. 2018) (reversing obviousness determination based on modification of a single reference without a rationale). While expert testimony may address whether such motivation existed at the time of invention, a conclusory expert opinion is entitled to no weight. Such testimony is "not sufficient and is fraught with hindsight bias." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012)

A party seeking to invalidate a patent based on obviousness must demonstrate by clear and convincing evidence both (1) that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention and (2) that the skilled artisan would have had a reasonable expectation of success in doing so" *See Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994, 997 (Fed. Cir. 2009) (finding no reasonable expectation of success because "there is no credible evidence that the structural modification was routine").

When prior art "teaches away" from a proposed modification or combination, the fact finder must consider the evidence as a whole and determine whether a skilled person, in light of the teaching away, would have found it obvious to make the modification or create the combination. *E.g., Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1365 (Fed. Cir. 2012) (reversing JMOL of obviousness and reinstating jury verdict based on credible evidence that prior art taught away from the invention); *Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1373-74 (Fed. Cir. 2000) (reversing the district court's conclusion of obviousness where "[t]here is clear evidence of teaching away in the prior art").

Hindsight is prohibited in analyzing whether an invention is obvious. For example, objective evidence from the time of the invention helps "turn back the clock and place the claims in the context that led to their invention." *Mintz*, 679 F.3d at 1378. Also, an obviousness defense must avoid hindsight *in the selection of prior art references*. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) ("The real question is whether that skilled artisan would have plucked one reference out of the sea of prior art (Phipps) and combined it with conventional coolant elements to address some need present in the field [].").

## III. ARGUMENT

American Tack's Motion to Amend to add the Keystone reference, new applications of Smith, and new combinations of prior art, fails because none of the factors supports amendment.

### A. Keystone

#### 1. American Tack Lacks Good Cause to Amend

There is no dispute that Keystone is a new reference. American Tack's expert discovered it on August 25, 2025, the day before his invalidity report was due. *See* ECF 65 (Scheduling Order), 1. ECF 121-14 (Deposition Transcript of Dr. Direen, "Direen Tr."), 33:15-25. He testified that nothing prevented him from accessing the Keystone reference at an earlier time if he had "gone searching earlier." Direen Tr., 35:5-10. Dr. Direen indicated that "what's known about spring clips" was one of his questions "up front." *Id.* 33:5-6. American Tack does not argue that the Keystone reference was hidden. It was not difficult to find. *See* Direen Tr. 60:16-62:17. Rather, neither Dr. Direen nor American Tack made the effort to look for prior art "spring clips" prior to August 25, 2025, the day before expert disclosures.

American Tack has had years to develop invalidity theories against the Asserted Claims. SnapPower sent American Tack a cease and desist letter accusing the Accused Products of infringing four of the five asserted patents on October 15, 2020. Williams Decl. Ex. 3 (2020.10.15 Letter to Terry Booth). On December 20, 2023, U.S. Customs and Border Protection ordered American Tack to stop importing the Accused Products because they violate SnapPower's patents. ECF 66-2 at 102-132 (CBP Ruling Letter H334472). SnapPower filed this case against American Tack on May 21, 2024. Yet American Tack waited until August 25, 2025, to look for "spring clip" prior art references like Keystone, because its expert report was due the next day.

American Tack argues that it disclosed Keystone the day after it was found, as if that reflected diligence. In reality, American Tack did not find Keystone until the day before Dr. Direen's invalidity report deadline because it did not look for it. Waiting until after disclosing its preliminary invalidity contentions, after the close of fact discovery, and the day before its expert report is due to begin searching for prior art "spring clips" does not show diligence.

### 2. Importance of Keystone

Keystone is not vital to Defendant's defenses. Defendant has raised invalidity defenses that do not involve Keystone against every asserted claim in this case. ECF 121-2 (Invalidity Contentions). Thus, excluding Keystone from the case will not leave Defendant with no invalidity defense. Additionally, Defendant's assertion that the Keystone reference is vital to its defense rings hollow. If Defendant truly believed the use of prior art "spring clips" was essential to its case then it would have looked for such prior art "spring clips" earlier and included them in its Invalidity Contentions. *Estech.*, No. 220CV00123JRGRSP, 2021 WL 5154220, at *4 (finding such assertions "severely undercut" by Defendants' decision not to include the theories in earlier disclosures).

Additionally, due to the closure of discovery, Defendant has not adduced evidence necessary to make Keystone a successful prior art reference. Several legal guardrails on obviousness, including those discussed below, stand in the way and undermine the professed "vitality" of the Keystone reference.

First, Defendant must establish that a reference is analogous art: "from the same field of endeavor" or "reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992). The parties' technical experts agree that the relevant field is powered cover plates, referring to a cover plate that includes built-in functionality that uses power. Direen Tr. 38:19-39:15 (referring to powered cover plates as the relevant field for prior art); Horenstein Rebuttal ¶ 7 (identifying the relevant field of the art as the design of powered cover plates for standard residential electrical fixtures such as wall outlets and switches). The Keystone reference is not in that field. Williams Decl. Ex. 2, Deposition Transcript of Dr. Horenstein ("Horenstein Tr."), 17:12-18:17; Williams Decl. Ex. 1 ("Horenstein Rebuttal") ¶¶ 25-27. The problem solved by the Asserted Patents is a powered cover plate that makes a reliable connection with the terminal screws on a broad array of configurations of outlet receptacles. In contrast, Keystone is designed for low voltage electronics, for connection with batteries rather than wall outlet power, for mounting on a printed circuit board, not in higher-voltage devices like an

outlet receptacle. As a result, "a person of skill in the art would've looked elsewhere for a structure relevant to active cover plates." Horenstein Tr. 26:17-27:4. American Tack makes no attempt to show that Keystone is analogous art and has developed no evidence (not even expert opinions) to support such an attempt.

Second, the combination of Keystone with other prior art (or the modification of other prior art to adopt features of Keystone) is an obviousness argument that must be supported by a motivation to combine. *ActiveVideo Networks*, 694 F.3d at 1327-28. The motivation must come from the perspective of a skilled person in the field of the invention at the time of the invention. *Id.* at 1327. For such motivation, American Tack relies on the idea of a "simple substitution of known elements to yield predictable results." Motion, 4; *see also* ECF 121-11 (Direen Invalidity Report) ¶ 60. Yet, as explained further below, American Tack's obviousness arguments require dismembering Keystone (cutting off the lower soldering attachment portion) and offer no explanation for why a skilled person would do that. Direen Tr. 57:10-58:15. Dr. Direen offered no explanation for how a skilled person would join a dismembered Keystone to a powered cover plate because "that would be very obvious." *Id.* 58:16-24. He did not show how it would be done in his report because he "found no reason to." *Id.* As Dr. Horenstein observed, "simple substitution" of Keystone into a powered cover plate is not possible. Horenstein Rebuttal ¶ 71 (image above).




For example, Dr. Direen fails to address where the soldering pin at the bottom of the Keystone part will go if combined with the tab structure of Ebeling, as shown above. *Id.* Dr. Direen concedes as much in his deposition by stating that "he was not suggesting that it [Keystone] would be used directly in this product." Direen Tr. 58:13-14. Dr. Direen did not address how Keystone would be combined with any prior art. *Id.* 58:16-24. Dr. Direen's testimony on Keystone was akin to the expert in *ActiveVideo*, which was "essentially a conclusory statement that a person of ordinary

skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions." *ActiveVideo Networks*, 694 F.3d at 1327 (giving no weight to conclusory expert testimony and affirming JMOL of nonobviousness). In sum, American Tack's "simple substitution" theory is not likely to succeed, and American Tack's expert has no other basis for a motivation to combine.

Third, even when there is a credible motivation to modify or combine references in an obviousness theory (there is none here), if prior art "teaches away" from the proposed modification or combination, the fact finder must weigh whether a skilled person, in light of the teaching away, would have found it obvious to make the modification or create the combination. *Ecolochem*, 227 F.3d at 1373-74. Here, one of American Tack's principal references, Ebeling, teaches away from having an electrical contact extend beyond the walls of the insulation. Horenstein Rebuttal ¶¶ 53-54. This teaching is confirmed by American Tack's expert, highlighting that prior art teaches the goal of powering the electrical face plate "while not causing shorts or other electrical hazards." Direen Invalidity Report ¶ 35; *id.* ¶ 43 (quoting Ebeling). This teaching is directly contrary to the proposed application of Keystone to Ebeling and other asserted prior art, which would cause the contact to extend beyond the cavity of the insulation material as taught in Ebeling, creating a risk of short circuits or other electrical hazards. Horenstein Rebuttal ¶ 54. Here, American Tack has adduced no credible motivation, much less a motivation strong enough to overcome the teaching away that, at the time of invention, would have advised a skilled person away from American Tack's proposed application of Keystone.

Fourth, obviousness requires that a skilled person must have a reasonable expectation of success in making a proposed modification or combination. *Procter & Gamble*, 566 F.3d at 994. American Tack has developed no evidence – and could not since it did not look for Keystone until after the close of fact discovery and the day before expert disclosures were due – to carry its burden of clear and convincing proof on this element of its applications of Keystone to obviousness. As described above, Dr. Direen did not address how Keystone would be combined with any prior art. *Id.* 58:16-24. He offered no explanation because "that would be very obvious." *Id.* He did not show

how it would be done in his report because he "found no reason to." *Id.* Although Keystone comes with an attachment mechanism, a soldering pin for attachment to a printed circuit board, Dr. Direen did *not* believe that Keystone's existing attachment mechanism would be used to modify a powered cover plate. *Id.* 57:10-58: 15. American Tack and Dr. Direen developed no additional evidence of how the Keystone part would be installed. *Id.* 56:1-57:9. Dr. Horenstein addressed this omission in his rebuttal report:

> Dr. Direen similarly asserts that the Keystone part "could be embedded in the power transmission tab of Ebeling," but he fails to explain how this might be accomplished. Moreover, he ignores the fact that the Keystone electrode is designed for mounting via a solder connection on a printed circuit board. The latter approach is far from the mounting methods disclosed in Ebeling, and does not support Dr. Direen's assertion that, "Incorporating the Keystone contact into the transmission tab of Ebeling is the incorporation of a known design in a familiar way to achieve a predictable result." (Direen Report at Par. 60). He does not address where the soldering pin at the bottom of the Keystone part will go if/when combined with the tab structure of Ebeling, or how the tabs of Ebeling or the Keystone contact would be modified to make such a combination.

Horenstein Rebuttal ¶ 71.

Importantly, American Tack's proposed application of Keystone is not Keystone itself but a disembodied and dismembered version of Keystone—not as a POSA would have encountered it. In the deposition of Dr. Horenstein, American Tack's counsel pressed repeatedly for the witness's opinion on an *upper portion* of the Keystone, notwithstanding Dr. Horenstein's testimony that "it's what's below it that makes it important to the technology at hand." Horenstein Tr., 24:2-19 (asking the witness to "look above the two holes" and "consider that part of the design"); *see also* 19:13-20:23; 22:6-16; 25:1-11. American Tack's expert, Dr. Direen, testified

that his use of the Keystone part was for the spring contact portion only. *See infra.* His invalidity analysis did not address how Keystone would be installed on in a powered cover plate:

Direen Tr. 58:3-24. As reflected in Dr. Direen's testimony, no party believes that Keystone would

Q. And in applying the Keystone battery
contact in the context of your report, did you assume
that it would be installed on a printed circuit
board?
A. No.
Q. Did you assume that it would not be
installed on a printed circuit board?
MR. GRIGGS: Objection to form.
A. Showing that contact just shows the
types of contacts that were readily available in the
market. I was not suggesting that it would be used
directly in this product, just showing that this type
of spring contact was well known in the market.
Q. (BY MR. WILLIAMS) Okay. So you didn't
really address one way or another how the Keystone PC
battery contact would be installed in your invalidity
analysis?
A. To me that would be very obvious to any
person of ordinary skill in the art.
Q. But you did not show how it would be
done in your report?
A. I found no reason to.

be combined with a powered cover plate using Keystone's existing attachment method (soldering pin). Horenstein Rebuttal ¶ 27 ("The intended use and method of affixing the Keystone part is thus very different from what is disclosed in these Asserted Patents."). Thus, in addition to the three separate deficiencies described above, American Tack's application of Keystone founders for a fourth reason: failure to meet the legal requirement of a reasonable expectation of success.

Fifth, hindsight is always prohibited in analyzing whether an invention is obvious. In particular, when the obviousness theory requires the skilled person to select a design from among a myriad of options in the prior art, the selection cannot be driven by hindsight. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) ("Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine

their elements."). The skilled person must have a non-hindsight reason for selecting the design. Here, Dr. Direen was very clear that he used hindsight to select the Keystone part. To begin, his report stated, and he confirmed in deposition, that such parts "are produced in an unlimited variety of shapes from a wide assortment of materials." ECF 121-11 (Invalidity Report) ¶ 31; Direen Tr. 49:14-50:22. Within this vast array, he looked for spring clips shaped like the Accused Products that were dated before the Asserted Claims. Direen Tr. 59:10-24. Dr. Direen also considered the scope of the Asserted Claims in his search for Keystone. *Id.* 62:18-63:9. Nothing else guided the selection of the Keystone part among numerous other configurations of "spring clips" or other means for establishing an electrical connection for use in Dr. Direen's invalidity opinions. 63:10-22. American Tack's obviousness defense based on Keystone is unabashed hindsight.

**3. Prejudice of Keystone**

As outlined above, American Tack's assertion of Keystone cues several guardrails circumscribing the defense of obviousness. Because Keystone was not disclosed in Defendant's Invalidity Contentions, or even during the discovery period, SnapPower was denied an opportunity to develop discovery on these issues relating to the Keystone part. There is no evidence on whether Keystone is analogous art. If Keystone had been disclosed during discovery, SnapPower would have developed evidence against an analogous art argument. SnapPower would also have developed rebuttal evidence on motivation to combine and reasonable expectation of success. SnapPower would have purchased the product to test whether it would "partially flatten" upon installation as required by claim 2 of the '945 Patent. It would have tested Keystone to determine whether the free end would "contact a wall" as required by claims 1 and 7 of the '045 Patent. It would have conducted discovery to determine whether the size and configuration of Keystone would have given a skilled person a reasonable expectation of success to use Keystone in a powered cover plate given the various dimensional requirements and restrictions attendant to designing a prong for a cover plate that can be used on a wide variety of outlet receptacle configurations. SnapPower was denied the opportunity to conduct any such discovery. American Tack's "simple substitution" theory on motivation to combine is vulnerable, particularly since Dr.

Direen "was not suggesting that it [Keystone] would be used directly" in any prior art. Direen Tr. 58:13-24.

SnapPower's expert had two weeks to prepare a validity rebuttal report, to address all invalidity theories presented by Dr. Direen, including Keystone and other new invalidity theories. *See* ECF 121 (SnapPower Motion to Strike Portions of Invalidity Report). SnapPower also deposed Dr. Direen on his invalidity report, including Keystone and other new invalidity theories. American Tack argues that, in taking these steps, SnapPower cured any prejudice arising from Defendant's failure to include Keystone and other new invalidity theories in the Invalidity Contentions. Motion, 17. To the contrary, through Horenstein's rebuttal report and Direen's deposition (each cited above), SnapPower learned that Dr. Direen did not look for Keystone until the day prior to his expert report deadline, that Keystone is not in the field of the Asserted Claims, and that American Tack's proposed use of Keystone involves removing its attachment mechanism (soldering pin) without any specific replacement, among other deficiencies in the obviousness analysis. Far from waiving any rights, SnapPower was doing all it could to prepare a response on the merits and uncovering additional grounds to oppose American Tack's ambush without the benefit of discovery.

SnapPower is further prejudiced by American Tack's untimely invalidity arguments because, during discovery, the Court, on Defendant's motion, required SnapPower to reduce its Asserted Claims from 115 patent claims to 20 asserted patent claims. ECF 59. Six months prior, the parties had already disclosed their respective Infringement and Invalidity Contentions, under Local Patent Rules (LPR) 3-2 and 3-3. Defendant's LPR 3-3 Invalidity Contentions played a key role in SnapPower's selection of patent claims to assert in this case going forward. This Court relied on SnapPower's selection of claim as a predicate to its Claim Construction Order. ECF 84, 1. If American Tack had disclosed Keystone and the other new invalidity arguments at the appropriate time, before SnapPower's selection of Asserted Claims, SnapPower may have selected different claims, including one or more claims of the '180 and '814 Patents, which are no longer asserted. This prejudice cannot be cured at this juncture.

### B. American Tack Lack Good Cause to Add Smith Provisional

The factual and legal grounds why the Smith Provisional and other New Invalidity Theories fail to comply with the Local Patent Rules are set forth in SnapPower's Motion to Strike (ECF 121) and are not repeated here. American Tack fails to show good cause to amend to add the Smith Provisional as an anticipating reference because it has known about the Smith Provisional from the outset of the case and even identified it as an obviousness reference against a *different* patent.

In an attempt to show good cause, American Tack cites *Kilopass Tech. Inc.* and argues that revisions to previously disclosed and charted prior art references may be permitted if they do not "substantially depart" from the original contentions. 2012 WL 1901198, at *3. This case is inapposite. First, the proposed amendments in *Kilopass* occurred during discovery—not after. Additionally, Defendant's proposed amendment is a substantial departure from *both* the Preliminary and Final Invalidity Contentions. The Invalidity Contentions reference Smith Provisional as a potential obviousness reference for the '945 Patent claims 1, 2, 3, 9, 10, and 15. ECF 121-2 (Invalidity Contentions), 36, 39. American Tack did not identify Smith as any kind of reference for the '773 Patent or the '788 Patent. Under LPR 3-3, the required disclosure of "identity of each item of prior art" is separate from "whether each item of prior art anticipates each asserted claim or renders it obvious," and each of those is separate from the requirement to provide a chart identifying where in each alleged item of prior art each element of each asserted claim is found. LPR 3-3(a)(1-3). That is because a party is not expected to hunt through nearly 1,000 pages of claim charts to learn the identity of each item of prior art. SnapPower understood that Smith was not asserted as an anticipating reference and was not asserted as prior art against the '773 Patent or '788 Patent because neither the Preliminary nor the Final Invalidity Contentions identified Smith in relation to any claim of those patents. Raising a new anticipation argument against a new claim is a substantial change and not fairly disclosed by American Tack's Preliminary or Final Contentions.

The Smith Provisional is not vital to Defendant's defenses. If they were, American Tack would have identified it earlier and included it as an anticipating reference against the Asserted

Claims of the ’773 Patent and ’788 Patent in its Invalidity Contentions. By ambushing SnapPower with Smith Provisional as an anticipation reference, American Tack beat 80% of SnapPower’s patent claims via Claims Reduction (ECF 59, 64), skirted any discovery, and preserved the defense for trial. This kind of gamesmanship should not be rewarded.

**C. American Tack Lacks Good to Add New Invalidity Theories**

SnapPower has identified several invalidity arguments—both anticipation and new obviousness combinations—against several Asserted Claims that American Tack disclosed *for the first time in this case* in Dr. Direen’s Invalidity Report, more than ten months after the October 18, 2024, deadline for Invalidity Contentions. These New Invalidity Theories are listed in ECF 121 (Motion to Strike) at 9. *See also* Motion to Amend, 19. American Tack argues that these were disclosed in the LPR 3-3(a)(3) claim charts of its Invalidity Contentions. However, the charts only show where each element of each asserted claim is found in each alleged item of prior art. LPR 3-3(a)(3). Defendant’s invalidity claim charts are medley of excerpts from many different reference, listed under each element of each asserted claim; there is no indication of what references are alleged to anticipate or what combinations of references are asserted as an obviousness defense. The claim charts disclosure does not fulfill the requirement to disclose “whether each item of prior art anticipates each asserted claim or renders it obvious.” LPR 3-3(a)(2). SnapPower should not have to guess from the claim chart “whether each item of prior art anticipates each asserted claim or renders it obvious.” LPR 3-3(a)(2); *see Ironworks Patents LLC v. SamsungElectronics Co.*, No. 17-cv-01958-HSG, 2017 WL 4573366 at *3 (N.D. Cal. Oct. 12, 2017) (striking contentions that failed to identify which combinations of prior art were alleged to render unspecified claims of a patent invalid as obvious).

American Tack fails to show good cause to amend to add the New Invalidity Theories because it has known about all the references from the outset of the case. Waiting until after the close of discovery to think about new combinations of references, or new anticipation arguments, is the opposite of diligence. Nor are the New Invalidity Theories vital to Defendant’s defenses. If they were, American Tack would disclosed them at the proper time.

### D. Continuance Is Not Available

SnapPower has done its best to minimize the disruption caused by American Tack's new prior art ambush, by continuing with expert reports and discovery, including the deposition of Dr. Direen. However, as discussed above, this was done out of an abundance of caution should SnapPower have to defend against those attacks at trial and does not cure the prejudice of having to respond to new prior art and new invalidity theories without fact discovery. Nothing short of re-selecting the 20 asserted claims and going back through claim construction would cure the prejudice of SnapPower having to drop more than 80% of its patent claims without knowledge of the Invalidity Contentions it would face at trial.

This case is in the final stages of pre-trial; expert reports are finished, dispositive motions are filed; and trial is less than three months away. Reopening claim construction, or fact discovery, would unduly prolong the proceedings and strain the parties' resources. Critically, American Tack has not shown *good cause* for obtaining any such drastic revision to the case schedule. Also, this case has already been continued once by three months. *Compare* ECF 33 with ECF 65. These factors weigh strongly against a continuance and against American Tack's Motion to Amend.

### E. American Tack Cannot Bootstrap Good Cause by Vilifying SnapPower

American Tack accuses SnapPower of delaying "five weeks" before objecting to American Tack's injection of new prior art and new invalidity theories into its expert's Invalidity Report. Motion, 17. Yet, the purported "delay" consisted of responding to American Tack's ambush *through expert discovery*. The Scheduling Order (ECF 65) gave the parties two weeks to prepare rebuttal reports and then two weeks to conclude expert discovery. American Tack served the Invalidity Report on August 26, 2025. Two weeks later, SnapPower served Dr. Horenstein's validity rebuttal report on September 9, 2025, responding to the entirety of the Invalidity Report. By agreement, the parties conducted expert depositions three weeks later. On October 1 and 3, 2025, respectively, SnapPower took Dr. Direen's deposition and American Tack took Dr. Horenstein's deposition. SnapPower notified American Tack of its objections to Keystone and new materials in the Invalidity Report on September 30, 2025. American Tack cites no rule or

legal authority violated by SnapPower's decision to prepare a rebuttal report and engage in expert discovery before raising its objection to the new invalidity materials.

If SnapPower had objected earlier, American Tack identifies nothing that it would have done differently. Although there are circumstances (such as at trial and during depositions) where objections are waived if not made timely so as to give the party an opportunity to correct the objectional material, this is not such a circumstance. American Tack is not arguing that it would have taken corrective action to withdraw Keystone if SnapPower had objected earlier. Indeed, there is nothing American Tack could have done to overcome the objection. Thus, if SnapPower had acted faster, or filed an emergency motion to exclude Keystone and the new invalidity theories, that would have only disrupted the expert discovery schedule, and likely the entire case schedule, for no apparent benefit. Far better to proceed with expert discovery, as SnapPower did, and litigate the objection in manner that avoids such disruption.

American Tack also accuses SnapPower of delaying in filing its Motion to Strike (ECF 121) portions of the Invalidity Report. Yet, SnapPower acted with reasonable diligence in filing the Motion to Strike. Following expert deposition on October 3, 2025, the parties were preparing to file dispositive motions by October 21. The parties met and conferred by phone and email regarding the Motion to Strike on October 7, 13, and 14, but did not reach agreement. SnapPower prepared its Motion to Strike concurrently with its motion for partial summary judgment and filed them both on October 21, 2025, a mere week after reaching an impasse on October 14. Nothing in this timeline justifies American Tack's injection of Keystone and new invalidity theories into this case more than 10 months after the deadline for its Invalidity Contentions.

American Tack further accuses SnapPower of reneging on a proposed compromise. Motion, 6-7. This accusation omits key facts and is irrelevant to the Motion to Amend. *Cf.* Fed. R. Evid. 408 (encouraging compromise offers). The facts overlooked by American Tack are as follows. When counsel met and conferred regarding Keystone and other new invalidity theories on October 7, 2025, counsel soon reached an impasse; Defendant's counsel disputed whether Keystone and other new invalidity theories were even "new." ***American Tack's counsel*** raised a

potential compromise of mutually withdrawing the parties' respective objections to contentions, but indicated it had not discussed this proposal with American Tack (ECF 128-3, at 1); counsel agreed to discuss the option with their respective clients, leaving the ball in American Tack's court (*id.*). American Tack did not follow up. *Id.* Consequently, on October 13, 2025, SnapPower's counsel emailed to decline to proposed compromise. ECF 128-3, at 4. American Tack's counsel then proposed that American Tack was willing to withdraw its motion to strike relating to Gen 3 if (i) SnapPower agreed not to challenge American Tack's invalidity arguments as it is proposing to do; and (ii) SnapPower withdrew the pending motions relating to email discovery and depositions. *Id.* Having already rejected (i) and unwilling to forego all email discovery in this case, SnapPower rejected American Tack's offer. *Id.* at 3-4. On October 14, American Tack returned to the proposal of both parties dropping their respective objections to contentions, but SnapPower had already rejected that proposal on October 13. *Id.* Nothing in this exchange should enable American Tack to bring new prior art and invalidity theories into the case after the close of discovery—invalidity arguments that have been available since before this case was filed.[2]

American Tack's delayed and failed disclosures is the common thread in ***both*** pending motions to strike contentions (ECF 121 and ECF 94). For SnapPower's Infringement Contentions, SnapPower, from the beginning, accused the "LumiCover and GloCover products" of infringement, along with all Defendant's products of "substantially equivalent structure and function." ECF 110-2 (Infringement Contentions) at 2. American Tack began importing its "Generation 3" of the LumiCover and GloCover Accused Products slightly before this case was filed (May 2024) but did not tell SnapPower until several months later, after the deadline for infringement contentions but still during the discovery period. Generation 3 was not an effort to design around the Asserted Claims, and once SnapPower had a chance to review the design, SnapPower told American Tack that Generation 3 infringed and conducted discovery on Generation 3. ECF 111, pp. 4-5. American Tack's Motion to Strike (ECF 94) seeks to prevent

---

[2] By contrast, American Tack's Generation 3 version of the Accused Products, which *were* the subject of discovery, should be acknowledged as in the case. *See* ECF 111.

SnapPower from accusing Generation 3 LumiCover and GloCover products of infringement. For American Tack's Invalidity Contentions, American Tack did not disclose what it now claims are its favorite invalidity theories (and perhaps did not even develop them) until its expert report deadline and then added them to the expert report. SnapPower responded to the ambush through expert discovery and then in SnapPower's Motion to Strike (ECF 121).

American Tack attempts to point the finger back at SnapPower as an excuse for American Tack's own lack of diligence. American Tack has knowingly infringed multiple SnapPower patents and mocks the Asserted Claims as "extreme redundancy." Motion to Amend, 2. These behaviors do not excuse American Tack from timely disclosing its Invalidity Contentions. As shown above, SnapPower acted diligently, and American Tack offers no justification for its own *ten months* delay in disclosing new invalidity theories after the Local Patent Rules 3-3 deadline for such disclosures, October 18, 2024 (ECF 33, at 2).

## IV. CONCLUSION

For the reasons stated above, SnapPower respectfully requests the Court to deny American Tack's Motion to Amend and grant SnapPower's Motion to Strike (ECF 121) the portions of Dr. Direen's Invalidity Report and Supplemental Invalidity Report that rely on new references (Keystone and Smith Provisional) or (2) the New Invalidity Theories.



151202627.1 0064461-00009

DATED: November 21, 2025

STOEL RIVES LLP

By: /s/ *Elliott J. Williams*

Chad E. Nydegger (Bar No. 9964)
*cnydegger@wnlaw.com*
Sarah M. Terry (Bar No. 19092)
*sterry@wnlaw.com*
WORKMAN NYDEGGER
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 533-9800
Facsimile: (801) 328-1707

Elliott J. Williams (OSB 144835)
*elliott.williams@stoel.com*
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503-294-9571

*Attorneys for SnapRays, LLC dba SnapPower*